**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-6440**

_____

RAMINDER KAUR,

          Petitioner - Appellant,

    v.

WARDEN, Maryland Correctional Institution for Women,

          Respondent - Appellee.

------------------------------

MARYLAND CRIMINAL DEFENSE ATTORNEYS' ASSOCIATION (MCDAA),

          Amicus Supporting Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, Chief District Judge.  (1:21-cv-01780-GLR)

_____

Argued:  January 29, 2025                  Decided:  August 19, 2025

_____

Before HEYTENS and BERNER, Circuit Judges, and Elizabeth W. HANES, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Vacated and remanded by published opinion.  Judge Berner wrote the opinion, in which Judge Heytens and Judge Hanes joined.

_____

**ARGUED:**  Kevin B. Collins, COVINGTON & BURLING LLP, Washington, D.C., for Appellant.  Jer Welter, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND,

Baltimore, Maryland, for Appellee. **ON BRIEF:** Peter Lu, Cody J. Reeves, Sameer Aggarwal, COVINGTON & BURLING LLP, Washington, D.C., for Appellant. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. Nancy S. Forster, FORSTER LAW, LLC, Towson, Maryland; Lisa J. Sansone, LAW OFFICE OF LISA J. SANSONE, Baltimore, Maryland; Michelle M. Martz, MICHELLE M. MARTZ, P.A., Frederick, Maryland, for Amicus Curiae.

_____

BERNER, Circuit Judge:

It would be "intolerable" to require a criminal defendant to surrender "one constitutional right . . . in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Yet that is what Raminder Kaur asserts occurred here. After her first criminal trial in Maryland state court was marred by ineffective assistance of counsel, Kaur moved successfully to set aside the verdict. During the proceedings on her motion for a new trial, the trial court ordered Kaur to turn over a significant amount of material to the State. That material included attorney work product and attorney-client privileged communications which revealed the existence of evidence previously unknown to the State. Kaur also testified in support of her motion and was subjected to a lengthy cross-examination.

The trial court declined to issue a protective order barring the State from relying upon the privileged material Kaur was ordered to produce during the motion for a new trial. The trial court also permitted the State to use the same prosecution team that opposed Kaur's motion for a new trial in her second trial. The trial court also left open the possibility that the State could use Kaur's testimony from the proceedings on her motion for a new trial to cross-examine her if she took the stand in her own defense. The second jury convicted Kaur once again.

On direct appeal from that conviction, the Maryland appellate court assumed that the trial court had erred by allowing the State to use the same prosecution team and to use knowledge it had gained during the motion for a new trial against Kaur in her second trial. Rather than order a third trial, however, the appellate court determined that Kaur suffered no prejudice either from the State's use of the new evidence or from the threat that the State

3

might be able to use Kaur's testimony in the motion proceedings against her if she took the stand. Both conclusions were objectively unreasonable.

The State relied heavily on the new, privileged evidence it obtained during the proceedings on Kaur's motion for a new trial in prosecuting Kaur a second time, and that new evidence harmed Kaur's defense. In addition, the possibility that the State might use Kaur's motion testimony to impeach her if she took the stand in her second trial also clearly harmed Kaur's defense. It effectively prevented her from testifying, including about significant exculpatory evidence.

Though we conclude that the Maryland appellate court's determination was objectively unreasonable, we cannot grant Kaur's habeas petition at this point. Because the Maryland appellate court merely assumed (but did not conclude) that a constitutional right was violated, we vacate and remand to the district court to determine in the first instance whether a constitutional violation occurred.

## I. Background

On the morning of October 12, 2013, Preeta Gabba was shot and killed outside of her home on Crystal Rock Drive in Germantown, Maryland. The investigation into Gabba's murder quickly focused on her ex-husband Baldeo Taneja and his wife Raminder Kaur. Taneja and Kaur were tried jointly in Maryland state court for Gabba's murder.

4

A. The First Trial

At her first trial, Kaur was represented by attorneys Alan Drew and Stephen Mercer of the Maryland Office of the Public Defender. Taneja retained separate, private defense counsel.

The Maryland Court of Special Appeals[1] described the State's case during the first trial as "largely circumstantial and centered on motive and opportunity." J.A. 4441. During the first trial, the State's theory was that Taneja and Kaur conspired to kill Gabba together, but it was Kaur who fired the fatal shots.

The State set out Taneja's motive for the murder as follows: Gabba and Taneja were married in 2002 in India where they lived together for four years. Taneja then moved to the United States, leaving Gabba in India. After arriving in the United States, Taneja became involved in an extramarital relationship with Kaur. In 2009, Gabba moved to the United States to join Taneja. After she arrived, Gabba learned of Taneja's relationship with Kaur, and she and Taneja became embroiled in contentious divorce proceedings.

Although their divorce was finalized in July 2011, interactions between Taneja and Gabba continued to be acrimonious. In September 2013, Taneja and Gabba were in the midst of a contempt dispute in state court over Taneja's failure to pay alimony and to transfer to Gabba certain property in India as required by their divorce agreement. A contempt hearing had been scheduled for October 10, 2013—two days before Gabba was

---

[1] The Maryland Court of Special Appeals' opinion is the "last reasoned decision of a state court addressing the claim" and is accordingly the opinion to which we apply habeas review. *See Allen v. Stephen*, 42 F.4th 223, 247 (4th Cir. 2022) (citation omitted).

murdered—but several days before the hearing Gabba's and Taneja's attorneys negotiated an agreement for Taneja to pay the arrears. Notably, the divorce agreement provided that alimony payments were to terminate upon the death of either party.

The State's theory of Kaur's motive was similar to Taneja's, though significantly less compelling. The State contended that Kaur knew of Taneja and Gabba's contentious divorce and that Kaur was partially funding Taneja's alimony payments to Gabba. The State conceded, however, that the evidence of Kaur's motive was weaker than Taneja's. J.A. 1481–82 ("We had a strong circumstantial case as to Mr. Taneja. We had a motive for Mr. Taneja. He was clearly the one in the hostile divorce. We had a lot of evidence that showed he was angry at [Gabba]. We did not have that evidence for [Kaur].").

In support of its case, the State put forth the following evidence: At the time of Gabba's murder, Taneja and Kaur were married and living together in Nashville, Tennessee. Approximately five weeks before the murder, Taneja attended a day-long gun training course in Tennessee. Soon after, Kaur and Taneja went to a gun supply shop where Taneja purchased two handguns, a Ruger GP100 and a .357 Ruger LCR, along with two boxes of ammunition, a holster, and supplies to clean and care for the guns. The day before the murder, Taneja travelled with Kaur to attend a work-related conference in Montgomery County, Maryland. They stayed at a hotel only eight miles from where Gabba was murdered.

Three eyewitnesses testified about what took place at the murder scene. One witness testified that at approximately 7:45 on the morning of October 12, 2013, she and her son were driving down Crystal Rock Drive when they heard several gunshots. She testified that

6

she slowed her vehicle and observed two individuals that she believed to be women in the street ahead of her. One of the individuals began to cross the street in the middle of the block, while the other individual followed close behind. She testified that she heard gunshots, and the first individual—who turned out to be Gabba—fell into the street in front of the witness's car. The second individual ran away. She and her son described the individual who ran away as a Black woman wearing a bright orange scarf.

A man living in an apartment about 100 yards from the scene of the murder testified that he heard gunshots and looked out his window. He saw a woman lying on the ground and saw someone running away. The witness described the person running away as a woman in her late 40s or early 50s with dark black hair wearing a bright head scarf. Like the mother and her son, the third witness told the police that the fleeing woman was Black. Although all three witnesses said they thought the shooter was a woman, none was able to identify the shooter by appearance and their descriptions of the shooter's height and weight more closely resembled Taneja's stature than Kaur's.

Taneja and Kaur's car had a GPS device that recorded its location. On the morning of the murder, the GPS only began recording location data at 9:58 a.m., when the couple was already headed toward the location of the conference. The GPS data showed they arrived at the conference just before noon. One witness explained that Taneja and Kaur declined to stay at the conference for lunch because Kaur was not feeling well. The vehicle's GPS device showed the couple stayed at the conference for less than one hour. After they left, Taneja and Kaur drove for approximately twelve hours, from the location of the conference in Maryland to their home in Tennessee.

7

Several hours after the murder, police detectives repeatedly attempted to call Taneja on his cell phone. The calls went directly to his voicemail. The police then obtained warrants for Taneja and Kaur, who were apprehended in Tennessee the following afternoon. At the time of the arrest, the police recovered from the couple's car one black and grey streaked wig, black hair dye, a black jacket, a plastic packaging bag, a .357 Ruger LCR revolver, and a 100 Ruger revolver. Experts testified that the three bullet specimens recovered from Gabba's body had all been fired from the .357 Ruger LCR revolver. Taneja's DNA was found on both guns, but Kaur's DNA was not.

The jury found both Kaur and Taneja, who were tried together, guilty of first-degree murder.

### B. Kaur's Motion for a New Trial

Ten days after the first trial, Kaur filed a motion for a new trial on the basis of ineffective assistance of counsel. In support of her motion, Kaur submitted a detailed affidavit which she and her defense counsel Attorney Drew signed. The affidavit explained that Attorney Drew had failed in a number of ways to represent Kaur effectively, including by telling Kaur that because she was tried jointly with her husband Taneja, she would not be permitted to testify because of marital privilege. The affidavit explained that Kaur had wanted to testify at trial and would have done so had she not been misinformed by Attorney Drew. The affidavit also stated that Attorney Drew was unprepared for trial because he failed to meet with Kaur; failed to issue subpoenas for out-of-state evidence, including police reports detailing Taneja's violence against Kaur; and did not provide notice of expert witnesses, leading to their exclusion from trial. Attorney Drew also did not identify or call

8

witnesses to testify about Kaur's character and beliefs, or her relationship with Taneja; and failed to raise with the trial court Kaur's lack of competency due to post-traumatic stress disorder she suffered from Taneja's abuse.

The affidavit stated that, if she had testified, Kaur would have testified about Taneja's emotionally and physically abusive behavior toward her during the course of their marriage, but particularly in the time leading up to the murder. She had wanted to testify that, the morning of the murder, she uncharacteristically overslept and awoke feeling unwell and disoriented. She had wanted to testify that she had no knowledge at the time of the shooting that there were guns in their car or that Taneja had planned to kill Gabba. She had wanted to testify about Taneja's bizarre behavior that morning and about his sudden decision to return directly to Nashville.

The affidavit also stated that Kaur wanted to testify about two conversations she had with Taneja while they were being transported together before and during trial. According to the affidavit, in those conversations, Taneja told Kaur that he had killed Gabba, and that if Kaur remained silent at trial she would be set free. Taneja had admitted that on the night before the murder he had drugged Kaur so that she would oversleep the following morning. The affidavit went on to describe how Taneja drugged Kaur because he knew she would try to stop him from leaving the hotel to kill Gabba. Significantly, the affidavit also averred that Taneja told Kaur that he dressed in a women's blouse and wig to disguise himself as a woman when he shot Gabba.

During the proceedings on Kaur's motion for a new trial, the State was represented by the same attorneys that prosecuted the first trial. The State immediately moved to

9

subpoena all investigative and trial files belonging to Kaur's defense counsel, Attorneys Drew and Mercer. At the hearing on the State's motions to subpoena this evidence, Kaur asked the court to limit the materials she would be required to produce, arguing that State's requests exceeded information relevant to her ineffective assistance of counsel claim. The trial court denied Kaur's request and ordered Attorneys Drew and Mercer to turn over the defense files to the State.

Critically, the defense files from Kaur's first trial included an email message from Attorney Mercer discussing how the defense could develop exculpatory evidence should the evidence of a *second* wig come to light. The State had previously been unaware that there was a second wig. At the time of Taneja and Kaur's arrest, the police recovered from their car only one black and grey streaked Halloween wig from CVS. During the first trial, the State was unaware that plastic packaging found in the car had originally contained an entirely different, more realistic all-black wig that had been purchased from a costume store called Performance Studios.

The trial court held a six-day evidentiary hearing on Kaur's motion for a new trial. During the proceedings, Kaur testified at length about what she had wanted to say at trial but did not because Attorney Drew erroneously informed her that she was unable to testify because of marital privilege. As in her affidavit, Kaur explained that she would have testified that she had been unaware that Taneja was married when they became involved, that Taneja verbally and physically abused her during their relationship, and that she harbored no animosity toward Gabba, and indeed they had never interacted.

10

Kaur also explained that she would have testified that, on the day before the murder, Taneja was verbally abusive toward her during their drive to Maryland. When they arrived at the hotel, Kaur was not feeling well. She asked if she could not attend the conference that evening. Kaur asked to rest and asked Taneja for medication. Taneja gave Kaur two pills. Kaur told Taneja that she only wanted one, but he "forced" her to take both. J.A. 1200. She became extremely sleepy immediately after taking the medication.

Kaur then described the morning Gabba was shot. Although Kaur routinely woke up in the middle of the night to meditate before returning to bed until the early morning hours, on the morning of October 12, 2013, she uncharacteristically slept until 8:30 or 9:00 a.m. She awoke feeling disoriented and in a fog. She noticed that Taneja was already awake and showered. Not wanting to upset him, Kaur rushed to take a shower. By the time she emerged, Taneja was already dressed and packing up their things. This struck Kaur as odd because throughout their relationship Taneja had always insisted that she lay out his clothes and pack their bags. When Kaur went outside to put the bags in their car, she discovered that the car was not where they had left it the previous night. It had been moved to a different location in the hotel parking lot. Taneja and Kaur left the hotel together at approximately 9:30 a.m. to drive to the conference.

When they reached the conference, Kaur continued to feel sick and began vomiting. Kaur asked Taneja to take her to her son's home, who lived nearby in Maryland. Kaur told Taneja that she would return to the conference when she felt better. The two got into the car. Feeling tired and sick, Kaur fell asleep. By the time she awoke, Kaur realized that they were not headed toward her son's home. Instead, Taneja told her that they were going back

11

to Nashville. During the drive, Taneja behaved oddly. He asked Kaur if she would take care of his children if something were to happen to him.

During the drive, Kaur's son called. He told Kaur that the police had just been at his house, and they informed him that Gabba had been murdered. Kaur was shocked by this news and she told Taneja of Gabba's murder. To her surprise, Taneja did not react. He simply kept driving. Taneja then took Kaur's phone from her and called the attorney representing him in the alimony dispute.

After arriving home, Taneja began to clean one of his handguns at the kitchen table. When Kaur asked him to put the gun away, Taneja refused and suggested they drive to the gun range to store the gun there. The police stopped Taneja and Kaur while they were on their way to the gun range and took them separately into custody.

The next time Kaur saw Taneja was at the police station. Taneja told Kaur that the police would ask her about his former wife, Gabba. Kaur asked Taneja why she had been arrested. He responded by telling her that "whatever has been done, I have done it, you have not done anything." J.A. 1222. When Kaur asked what he meant by that, Taneja calmly informed her that he had killed Gabba. He told Kaur that she should "keep her mouth shut" and that he would "deal with it." J.A. 1223–24. Kaur also testified that during the first trial, while she and Taneja were riding in a van back to jail, the two discussed evidence presented by the State that Taneja had been in a romantic relationship with another woman and had purchased clothing for her. Taneja told Kaur that he had purchased the women's clothing not for this purported love interest, but to disguise himself as a woman when he murdered Gabba.

12

The State then cross-examined Kaur at length. The State relied heavily upon documents obtained from Attorneys Drew and Mercer's files, including attorney-client communications with Kaur. The State questioned her about her relationship with Taneja and his abusive behavior, about her finances and specifically the source of funds used to pay Gabba's alimony, and about what was doing on the morning of the murder. The State concluded its defense against the motion for a new trial explaining that it had taken the opportunity to "scour" Kaur's defense file over the past year, and the prosecutor had "made a list of all the negatives that [would] befall [Kaur]" should she choose to testify. J.A. 1481, 1499.

Following the evidentiary hearing and argument, the trial court ruled in favor of Kaur, concluding that Attorney Drew's assistance had been ineffective. The trial court granted Kaur's motion for a new trial.

### C. Motion for a Protective Order

After she was granted a new trial, Kaur moved for a protective order seeking to prohibit the State from relying on the privileged information it obtained during the proceedings on her motion for a new trial. Kaur requested that the court bar the State from relying upon attorney-client privileged materials, including attorney-client communications and attorney work product. Kaur also requested that the State be required to use a different prosecution team in the new trial—one that had not been privy to the privileged evidence.

The trial court rejected Kaur's motion for a protective order. The trial court concluded that, by filing a motion for a new trial based on ineffective assistance of counsel,

13

Kaur had waived attorney-client privilege. The trial court also concluded that Kaur's concerns about disclosure of the defense's trial strategy were unfounded. The trial court reasoned that the defense's trial strategy would be different for the second trial and, in any event, both sides would have to show their trial strategy by disclosing witnesses. Even though the trial court determined Kaur had waived attorney-client privilege, the trial court still had concerns about "another round of post-conviction proceedings." J.A. 1570–71. The trial court thus prohibited the State from using as direct evidence Kaur's testimony relating to attorney-client communication or information contained in the affidavit filed in support of Kaur's motion for a new trial. J.A. 1570–71. However, the court reserved ruling on whether the State would be permitted to use testimony from the motion proceedings to impeach Kaur if she were to take the stand in her own defense at her second trial.

Finally, the court refused to bar the prosecution team that participated in the motion for a new trial from retrying the case. The trial court concluded that this was unnecessary to protect Kaur. The trial court gave significant weight to the State's interest in using experienced trial counsel who had worked on the case for the previous two and a half years. As a result of the court's ruling, the same trial team that prosecuted Kaur's first trial and that opposed the motion for a new trial would prosecute Kaur at her second trial.

### D. Motion *in Limine*

Before the second trial began, Kaur filed a motion *in limine*, again seeking to limit the State's use of privileged information disclosed during the proceedings on her motion for a new trial. Kaur sought to bar the State from using portions of her testimony that would otherwise have been protected by attorney-client privilege in preparation for the new trial.

14

Kaur also sought to bar the State from using her testimony from the motion proceedings to cross-examine her in the second trial.

The trial court heard argument on Kaur's motion *in limine* just hours before testimony began in the second trial. In opposition to the motion, the State argued that there was no way to prevent the prosecution from relying on the testimony and evidence adduced at the motion for a new trial, given their continued involvement in the case. J.A. 2967–68 ("I have all the information in my head . . . none of us can ever take out what's in our head. . . . I was at the motion for a new trial, so I'm exposed to it just the way I would be if I'm reviewing it to prepare for cross."). The State urged the court to "trust" that the prosecution would be able to differentiate between privileged and non-privileged information, and that the prosecution would refrain from relying upon privileged information. J.A. 2968.

The trial court reiterated its position that Kaur had waived attorney-client privilege. Although it found that Kaur waived privilege, the trial court ordered the prosecutors to cease using the transcript from the motion for a new trial. Nonetheless, it continued to allow the prosecutors to rely on their memory of the hearing to prepare for Kaur's cross-examination. The trial court noted that it was prohibiting direct use of the hearing transcript to "further insulate the State in the event that the appellate courts decide that [it was] wrong and that this is, in fact, an issue." J.A. 2969–70. The trial court, however, gave the prosecutors leeway to use the information by permitting the prosecution to have an assistant review the transcript to be able to refresh the prosecutor's memory as to what Kaur had testified about. The trial court continued to reserve judgment on the question of whether

15

the prosecution would be permitted to rely upon testimony obtained during Kaur's motion for a new trial to impeach Kaur if she chose to testify during the second trial.

### E. Kaur's Second Trial

At the second trial, the State revised its theory of the murder. Rather than maintaining that Kaur was the shooter, as it had done during the first trial, the State presented a new theory that Taneja may have shot Gabba with Kaur acting as an accomplice. Along with arguing that Kaur acted as an accomplice, the State also changed its presentation of the evidence. During the second trial, the State relied heavily on the fact there had been a second wig, which the State learned of only through the proceedings on Kaur's motion for a new trial.

In its opening statement, the State argued that Taneja and Kaur must have jointly planned and carried out the murder because there were *two* of several key evidentiary items:

> They find the Performance Studios wig packaging, without a wig in it, packaged up with the guns, but also a wig that wasn't opened from CVS. So we have two guns and two wigs. One wig is missing, and one wig is not opened. One gun was used in the murder; one gun wasn't. . . . So we have two guns, one used, one not. Two wigs, one used, one not. And two jackets, one used, one not. . . .
>
> And you're also going to hear that . . . in the car, when the police pulled it over [they] found evidence of two guns, two wigs, two jackets. . . .
>
> The police found two guns. There's evidence of two wigs and two jackets. . . . And two people in the world who have a motive to murder [Gabba], and [Kaur] is one of them.

J.A. 3023–24, 3026, 3030–31.

The State also brought forward a new witness in support of its theory about the second wig and Kaur's involvement in the murder. An employee of Performance Studios,

the costume store where Taneja and Kaur purchased the second wig, confirmed that the plastic bag packaging found in Taneja and Kaur's car corresponded with an 18-inch wig with straight, solid black hair. The State also called an electronic crimes unit law enforcement officer who offered a GPS analysis purportedly showing that Kaur and Taneja had visited Performance Studios on the same day that Taneja bought the murder weapon.

In closing arguments, the State reiterated the importance of the second wig to its theory of conspiracy:

> And the wigs, *why are there two wigs in the car, ladies and gentlemen? Why are there two wigs?*" One is missing, one is missing, and even the picture, the cardboard picture of what it should have been like is gone, so no one could see the type of wig that they once had, and then there's one there, *because, ladies and gentlemen, they were in this together. They were in this together. There was two guns, two wigs, two jackets. One wig missing, one jacket missing, because those were used*.

J.A. 4294–95 (emphasis added).

Kaur's defense team argued at the second trial that Taneja killed Gabba while acting alone and disguised as a woman. As during the first trial, the defense pointed out that the eyewitnesses' descriptions of the shooter's height and weight more closely matched Taneja's physique than Kaur's. The defense attempted to cast doubt on the use of the second wig by examining the Performance Studios employee about the time stamp on the receipt for the wig, which did not match the time that Taneja and Kaur purportedly purchased the wig from the store. The employee admitted during cross-examination, however, that the register may have been set to the incorrect time.

Because the trial court had reserved ruling on whether the prosecution could rely upon Kaur's testimony during the proceedings on the motion for a new trial, Kaur faced

17

the prospect of the State using her testimony to impeach her if she took the stand. Accordingly, Kaur again declined to testify on her own behalf. Wary of yet another trial, the trial court questioned Kaur under oath, confirming that she understood that she had the right to testify and would not be prohibited from testifying about her communications with Taneja. Kaur confirmed, but her counsel explained:

> to that point, Your Honor, just note that we have, with respect to other issues in the motion for a new trial, in particular our motion with respect to what materials the prosecution could review, and the recusal of the prosecution team. We still stand on our positions that were made there. We understand Your Honor to have overruled them, but that is part of the Defense's calculus, and Ms. Kaur's decision not to testify in this case.

J.A. 4233.

During the first day of deliberations, the jury sent a note to the trial court reporting that it was deadlocked. Ultimately, however, the jury returned a verdict finding Kaur guilty of first-degree murder.

### F. Kaur's Appeal to the Maryland Court of Special Appeals

After sentencing, Kaur timely appealed to the Maryland Court of Special Appeals ("Appellate Court"). The principal question on appeal was: "Did the trial court err in failing to protect Ms. Kaur from being tried by a prosecution team with extensive knowledge of Ms. Kaur's privileged communications with her defense counsel, communications among counsel about trial strategy, and investigative and strategic work product?" J.A. 4440.

The Appellate Court began its analysis by addressing the scope of Kaur's waiver of attorney-client privilege. The Appellate Court noted that the State had lawfully obtained

18

Kaur's privileged communications because Kaur waived "attorney-client privilege when she filed her motion for a new trial" claiming ineffective assistance of counsel. J.A. 4447.

Unlike the trial court, the Appellate Court recognized that the scope of that waiver was limited. It determined that Kaur's motion for a new trial on the basis of ineffective assistance of counsel constituted an implied, rather than explicit, waiver of attorney-client privilege. Accordingly, Kaur's waiver of attorney-client privilege was limited only to the motion for new trial proceedings. The Appellate Court thus concluded that the trial court erred in finding that Kaur had waived attorney-client privilege by filing the affidavit in support of her motion for a new trial.

Having determined that Kaur's waiver of attorney-client privilege had been limited to the motion for a new trial, the Appellate Court would have been faced with whether the trial court's decision to impose a limited protective order prohibiting use of Kaur's privileged information, but allowing a prosecution team with extensive knowledge of Kaur's privileged communications and work product to continue to try the case, was sufficient to protect Kaur's constitutional rights. The Appellate Court declined to reach that legal question, however, recognizing that it raised a complicated issue of first impression. Instead, the Appellate Court *assumed* the trial court erred in failing to bar the prosecutors and evidence from the motion for a new trial from the second trial. Because the Appellate Court assumed "putative error," Kaur's appeal turned entirely on whether that putative error was prejudicial. J.A. 4440.

The Appellate Court's prejudice analysis was twofold. First, the Appellate Court addressed Kaur's claim that she was prejudiced because the State presented evidence at the

19

second trial that Kaur and Taneja had purchased a second wig—a fact that had not been presented at the first trial and that Kaur alleged the State could only have learned from privileged information. J.A. 4452. Given that it was unclear "whether the State had an independent source for the information about a possible second wig," the court "assume[d] for purposes of analysis that Kaur is correct" as to the State's source of the information. J.A. 4453. Nonetheless, the Appellate Court concluded that Kaur suffered no prejudice. In fact, rather than prejudicing Kaur, the court suggested the second wig had actually *bolstered* Kaur's theory of the case.

Second, the Appellate Court rejected Kaur's claim that the prosecutors' knowledge of privileged information effectively precluded her from testifying. J.A. 4452. The Appellate Court recognized that "the trial court was concerned about the possibility of unfair advantage to the State if Kaur testified," and it emphasized that the trial court reserved ruling on whether the State could use that information to cross-examine Kaur until after she testified. J.A. 4452. Because Kaur elected not to testify, however, the Appellate Court concluded that the issue was moot. The Appellate Court further concluded that, absent a proffer from Kaur of what her direct testimony would have been, her argument that she had been prejudiced by the trial court's ruling was nothing more than a "bald assertion." J.A. 4452.

In sum, the Appellate Court concluded that although the prosecution possessed knowledge of Kaur's privileged communications and work product, Kaur failed to demonstrate that she suffered prejudice in her second trial as a result. Despite this conclusion, the Appellate Court gave a final admonishment to the trial court:

20

> Although there is not a basis for us to reverse Ms. Kaur's convictions under the current state of Maryland law, we nonetheless believe that the better course might have been for the trial court to have barred the Prosecution Team from directly or indirectly participating in the second trial.

J.A. 4461 n. 13.

### G. Subsequent Proceedings

Kaur appealed the ruling of the Appellate Court to Maryland's highest court, which denied certiorari. *Kaur v. State*, 466 Md. 225 (2019) (table). Kaur then petitioned for a writ of certiorari in the United States Supreme Court, which also denied certiorari. *Kaur v. Maryland*, 141 S. Ct. 5 (2020).

Having exhausted direct appellate review, Kaur filed an application for a writ of habeas corpus in the United States District Court for the District of Maryland under 28 U.S.C. Section 2254. The district court denied Kaur's petition. It noted, however, that it was "sympathetic to Kaur's dilemma," and that "[t]here are appreciable differences between the two trials." J.A. 4426 & n.6. Thus, the district court granted Kaur a certificate of appealability on the question: "was Kaur's Sixth Amendment right to counsel violated when her second trial was conducted by a prosecution team that had access to the defense file from her first trial, obtained through subpoenas issued by the state during post-trial proceedings?" J.A. 4427.

### II. Standard of Review

We review *de novo* the district court's assessment of an application for habeas relief. *Allen v. Stephan*, 42 F.4th 223, 246 (4th Cir. 2022). In doing so, however, we are "restricted

21

by the statutory language of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996" (AEDPA). *Bowman v. Stirling*, 45 F.4th 740, 752 (4th Cir. 2022) (citation and quotation marks omitted). These restrictions are "formidable." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). We address them as relevant below.

III. Analysis

AEDPA permits habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). Kaur pursues habeas relief under both avenues.

Kaur argues that the trial court violated clearly established federal law when it allowed her retrial by prosecutors with extensive knowledge of her attorney-client privileged materials. As noted above, however, the Appellate Court *assumed* for purposes of its analysis that the trial court erred by failing to bar the same prosecutors from Kaur's second trial. In doing so, the Appellate Court found that the trial court putatively violated Kaur's Sixth Amendment right to counsel. The Appellate Court thus presumed Kaur suffered a Sixth Amendment violation and denied Kaur relief based on its conclusion that Kaur was not prejudiced by that violation. For that reason, the state court opinion subject to our habeas review—the Appellate Court's opinion—did not deny Kaur the Sixth

22

Amendment right she claims is clearly established. Accordingly, Kaur is not entitled to relief under Section 2254(d)(1).

Thus, the question before us arises under Section 2254(d)(2): was the state court's decision based on an objectively unreasonable determination of the facts in light of the evidence presented in the state court proceedings? 28 U.S.C. § 2254(d)(2). More specifically, here, did the Appellate Court's finding of no prejudice rest on an objectively unreasonable determination of the facts? When we review this question, we presume as correct all factual determinations made by the state court "absent clear and convincing evidence to the contrary." *See id.* § 2254(e)(1). We do not take this test lightly. If "reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Wood v. Allen*, 558 U.S. 290, 301 (2010) (internal quotation and brackets omitted). While this is a highly deferential standard, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Our examination of the record before the state court compels us to conclude that two critical aspects of the Appellate Court's factual determinations were objectively unreasonable. The Appellate Court's determination that evidence discovered through attorney-client protected communications did not prejudice Kaur at the second trial was objectively unreasonable and ignored clear and convincing evidence to the contrary. In addition, the Appellate Court's determination that Kaur was not prejudiced by the prospect

23

that the prosecution might have been permitted to use her prior testimony against her if she testified in her own defense was objectively unreasonable and ignored clear and convincing evidence to the contrary. We address each point in turn.

### A. The State's Use of Newly Discovered Evidence

The Appellate Court's finding that the newly discovered second wig was not prejudicial—and in fact was *beneficial* to Kaur—proves objectively unreasonable in light of the record before the Appellate Court. As discussed above, the Appellate Court found that the State was unaware of the existence of a second wig during Kaur's first trial and only learned of its existence through attorney-client privileged materials produced in the proceedings on the motion for a new trial. The Appellate Court made this finding because there was no evidence that "the State had an independent source for the information about a possible second wig." J.A. 4453.

After concluding that the State only learned about the second wig through privileged materials, the Appellate Court then turned to whether Kaur was prejudiced at her second trial by State's use of this evidence. In discussing whether Kaur suffered prejudice by the State's reliance upon evidence of the second wig, the Appellate Court stated that:

> Ms. Kaur has provided no explanation for how she was prejudiced. The State's theory of the case did not change between trials. In each, the State theorized that Ms. Gabba's murderer could have been either Taneja or Ms. Kaur, but that it was more likely Ms. Kaur. And, in the second trial, the jury was instructed that Ms. Kaur could be found guilty as an accomplice to murder. None of the eyewitnesses to the shooting testified that the shooter was wearing a black and grey streaked wig, or, for that matter, any wig at all. Rather, the eyewitnesses all agreed that the shooter had dark hair.

J.A. 4453.

24

The Appellate Court made multiple clear errors in this recitation of the factual record. The Appellate Court first erroneously stated that the State's theory of the case was the same in both trials, that either Taneja or Kaur could have murdered Gabba "but that it was more likely Ms. Kaur." J.A. 4453. That statement is clearly incorrect based on the evidentiary record. During the first trial, the State claimed unequivocally that Kaur was the shooter. In the opening statement, the prosecutor asserted:

> [Gabba] was shot down in the street by this woman, by Raminder Kaur, and she was shot down in the street by Ms. Kaur pursuant to a plan that she conspired with Mr. Taneja to concoct and they concocted that plan weeks before the murder.

J.A. 2613. In the second trial, however, the State's theory had changed. The State set out to prove that Kaur was just as likely an accomplice. At the beginning of the second trial, the prosecutor claimed:

> Gabba was walking to the Germantown transit center from her apartment on Crystal Rock Drive when she was brutally gunned down, shot three times, and murdered by the defendant and the defendant's current husband, Baldeo Taneja. The defendant and Mr. Taneja planned this murder together. . . . And ladies and gentlemen, you're going to hear at the end of the case that regardless of the roles of either one of them, the fact that they planned it, prepared it, and made it happen together, regardless of who actually did what, they are both guilty of first-degree murder.

J.A. 3011. Indeed, the jury instructions for the second trial included an instruction for accomplice liability.

The Appellate Court also mistakenly found relevant that none of the eyewitnesses saw the shooter wearing the "*black and grey streaked wig*." J.A. 4453. The black and grey streaked wig was the only wig the State was aware of and raised during the first trial. It was the wig found in the back of Taneja and Kaur's vehicle at the time of their arrest. That

25

black and grey streaked wig, however, is not the wig that the Appellate Court should have considered as relevant to the eyewitness testimony. The relevant wig was the solid black wig purchased at Performance Studios. That was the second wig revealed through Kaur's attorney-client privileged materials. This distinction is critical. It is true, as the Appellate Court noted, that "none of the eyewitnesses to the shooting testified that the shooter was wearing a black and grey streaked wig." J.A. 4453. Instead, the eyewitnesses all testified that the shooter had dark hair. That is why the second wig overwhelmingly supported the State's theory at the second trial. The second, solid black wig, which went missing after the murder, was consistent with the eyewitness accounts of a shooter with entirely dark hair. The Appellate Court thus ignored clear and convincing evidence that the second wig actually supported the State's case.

It is also undeniable that the existence of the second, solid black wig supported the State's theory at the second trial. The State repeatedly mentioned the second wig in its opening statement, relying upon it to argue that Taneja and Kaur jointly planned the murder. In the words of the prosecutor: "[W]e have two guns and two wigs. One wig is missing, and one wig is not opened." J.A. 3024; "So we have two guns, one used, one not. Two wigs, one used, one not. And two jackets, one used, one not." J.A. 3024; "And you're also going to hear that . . . when the police pulled [the car] over and found evidence of two guns, two wigs, two jackets." J.A. 3026; "The police found two guns. There's evidence of two wigs and two jackets, and two tickets to [the convention] cover story." J.A. 3030–31. The State also introduced a new witness, a Performance Studios employee who testified

26

that the Performance Studios packaging found in Taneja's and Kaur's vehicle corresponded to the wig with solid black hair. J.A. 3876–77.

During closing arguments, the State returned to its theme that the key evidence came in twos:

> And the wigs, *why are there two wigs in the car, ladies and gentlemen? Why are there two wigs?* One is missing, one is missing, and even the picture, the cardboard picture of what it should have been like is gone, so no one could see the type of wig that they once had, and then there's one there, *because, ladies and gentlemen, they were in this together. They were in this together. There was two guns, two wigs, two jackets. One wig missing, one jacket missing, because those were used*.

J.A. 4294–95 (emphasis added). The State repeatedly relied on the existence of the second wig, which the prosecution referenced 13 times during closing argument.

The Appellate Court's suggestion the second wig provided "significant support" to Kaur's theory that Taneja was the shooter was objectively unreasonable based on the evidentiary record. The Appellate Court's conclusion relied on several statements made by the Performance Studios employee during cross-examination. It was plain from the record, however, that the employee's answers did not help Kaur. Defense counsel attempted to elicit responses to support a theory that the black-haired wig was designed for a man and that the time stamp on the receipt did not match the time that evidence showed Taneja and Kaur visited Performance Studios. Both lines of questioning were unavailing. The employee explained that all the of the wigs sold at the store are unisex and that the time stamp on store receipts did not necessarily reflect the actual time of the purchase because the store's cash register was not always synced to the correct time.

27

Ultimately, clear and convincing evidence shows that the second, black-haired wig, which the State learned of through attorney-client privileged materials, supported the State's theory that Kaur acted as Taneja's accomplice. The wig served as powerful evidence in support of the State's case and cut directly against Kaur's defense that she was not involved in the murder and Taneja had acted alone. The second wig thereby helped the State address Kaur's admittedly weak motive by connecting her to Taneja. The evidence of the second wig was, therefore, prejudicial. It was objectively unreasonable for the Appellate Court to conclude otherwise based on the evidentiary record before it.

### B. Kaur's Decision Not to Testify

The Appellate Court also rejected Kaur's claim that she suffered prejudice because the prosecutors' knowledge of her privileged information effectively precluded her from testifying in her own defense at her second trial. Here again, we begin with the clearly erroneous factual determinations made by the Appellate Court and then explain why the Appellate Court's determination that Kaur was not prejudiced was objectively unreasonable.

Before the second trial, Kaur filed a motion for a protective order and a motion *in limine* to limit the use of the testimony she had provided during the proceedings in support of her motion for a new trial. Although the trial court directed the State to cease reviewing the transcript from the proceedings, it permitted the prosecutors to rely upon their memory of what transpired at the hearing. The trial court also permitted the State to have an assistant locate relevant portions of the transcript and to use those portions to refresh the prosecutors' memories of Kaur's hearing testimony.

28

Crucially, the trial court reserved judgment on whether the State could use the testimony it obtained from Kaur's motion for a new trial hearing to cross-examine her at the second trial. The trial court reserved ruling until *after* Kaur provided direct testimony at the second trial, at which point Kaur would have no choice but to submit cross-examination by the State regardless of how the trial court ruled. Kaur made clear that she opted against testifying in her own defense because she could not be assured that the State would not be precluded from using attorney-client privileged information to cross-examine her.

Given the trial court's prior rulings, it was certainly possible that Kaur's testimony—tainted by attorney-client privileged materials—could have been used against her during cross-examination. The Appellate Court concluded nevertheless that "absent a proffer of what Ms. Kaur's direct testimony would have been" her claim that she was prejudiced was nothing more than a "bald assertion." J.A. 4452. After reviewing the evidence before the Appellate Court, we find this both a clearly erroneous determination of the record and an objectively unreasonable conclusion.

First, Kaur did, in fact, make a proffer as to what her testimony would have been. After Kaur explained that she would not testify, she referred the trial court to the proceedings on her motion for a new trial to explain her reasoning. There, she provided an affidavit and direct testimony[2] describing her anticipated testimony in significant detail. The trial court recognized this as a proffer during its colloquy with defense counsel about

---

[2] Kaur's counsel submitted a copy of the transcript from the hearing on the motion for a new trial into the record in support of Kaur's motion *in limine*.

29

Kaur's testimony, and the court explicitly recognized that Kaur's potential testimony would have related to Taneja's admissions of guilt.

Kaur's affidavit and testimony demonstrate more than a "bald assertion" of prejudice. Kaur developed a clear record of what she wished to testify to and why it was prejudicial to effectively preclude her from testifying. Kaur explained that she wanted to testify about: the emotional and physical abuse in her relationship with Taneja; oversleeping on the day of the murder because of drugs that Taneja had given her and waking up disoriented and feeling ill; and Taneja's strange behavior that day including his abrupt decision to return to Nashville. She also wanted to testify that she had no knowledge that there had been guns in their car, or that Taneja had planned to kill Gabba. Finally, Kaur wanted to describe Taneja's admissions that he had disguised himself as a woman and committed the murder while Kaur was sleeping at the hotel.

Kaur's inability to testify about these critical matters clearly prejudiced her defense. Kaur's defense at her second trial turned on her ability to create reasonable doubt as to whether Taneja carried out the murder alone. Likewise, the State's case hinged on proving that Kaur and Taneja planned the murder together. Kaur's testimony would have directly supported her theory of defense and undermined the State's case.

Had Kaur chosen to testify she would have placed herself at risk of being cross-examined with evidence that otherwise would have been protected by attorney-client privilege. The State told the trial court that evidence it obtained during the proceedings on Kaur's motion for a new trial, particularly her admission that she accompanied Taneja to Performance Studios to purchase the solid black wig, would have been "fabulous" evidence

30

in support of its case. J.A. 1489. The State would not have obtained that evidence but for the proceedings on the motion for a new trial, and Kaur was reasonable to presume that the State would have an opportunity to use the evidence to impeach her if she had testified at her second trial.

Kaur's inability to testify in her own defense without the threat of privileged evidence being used by the State on cross-examination was prejudicial. The Appellate Court's failure to recognize this clear prejudice to Kaur's Sixth Amendment right was objectively unreasonable. Kaur reiterated her argument to the trial court on multiple occasions over several years leading up to and during her second trial.

Supreme Court Justice Sonya Sotomayor recognized this very issue in her statement on this case in the Supreme Court's decision denying certiorari, stating that this case:

> [d]emonstrates the many insidious ways that potential Sixth Amendment violations can affect the course of a trial. Take, for example, Kaur's ability to testify in her own defense. After the trial court denied her motion to be tried by new prosecutors, Kaur filed a motion "to limit the scope of the State's cross-examination in the event that [she] chose to testify." Kaur's concern that the State might use her privileged information for its own advantage was hardly hypothetical: One of the prosecutors had, in fact, already informed the court that she had taken the opportunity to "scour" Kaur's defense file and that she had "made a list of all the negatives that [would] befall the defendant" should she choose to testify. After a "three-way discussion between counsel and the trial court," it was agreed that the prosecutor would "rely solely upon her recollection of Ms. Kaur's prior testimony" from the hearing on her motion for a new trial, but that one of the prosecutor's assistants could review the transcript "for exact wording." The court then "reserved any ruling on the scope of possible cross-examination until Kaur completed her direct testimony." Perhaps unsurprisingly, Kaur declined to testify.

*Kaur v. Maryland*, 141 S. Ct. 5, 6 (2020) (internal citations omitted).

31

## IV. Remedy

Having concluded that the Appellate Court's determination of the facts was objectively unreasonable and that Kaur was prejudiced by what the Appellate Court assumed to have been a violation of her Sixth Amendment rights, we remand to the district court to determine in the first instance whether there was indeed a violation of the Sixth Amendment. *See Cone v. Bell*, 556 U.S. 449, 476 (2009); *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015).

On remand, however, AEDPA's formidable limitations give way. *Valentino v. Clarke*, 972 F.3d 560, 576 (4th Cir. 2020). AEDPA permits a federal court "to bypass § 2254(d)'s limitations on relief when a state court has refused to 'adjudicate' a procedurally proper claim 'on the merits.' *Id.* Because the Appellate Court never reached the merits of Kaur's Sixth Amendment claim, federal habeas review on that issue is not subject to the deferential standard that applies under AEDPA to claims that were adjudicated on the merits in the state court proceeding. 28 U.S.C. § 2254(d); *Cone*, 556 U.S. at 472. Thus, the district court must review *de novo* the question of whether a constitutional violation occurred. *See, e.g.*, *Cone*, 556 U.S. at 472; *Rompilla v. Beard,* 545 U.S. 374, 390 (2005) (*de novo* review where state courts did not reach question); *Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (same).

## V. Conclusion

We hold that the Maryland Court of Special Appeals' finding of no prejudice was based on an objectively unreasonable determination of the facts in light of the clear and

convincing evidence presented in the state court proceeding. The Maryland Court of Special Appeals' decision rested, however, on an assumption that Kaur's Sixth Amendment rights had been violated. Because the issue of Kaur's constitutional rights has yet to be adjudicated on the merits, we vacate the district court's order denying Kaur's habeas petition and remand to the district court to decide this question *de novo*.

*VACATED AND REMANDED*